IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 7, 2004

**STATE OF TENNESSEE v. STACY JOHNSON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-06779-89   W. Otis Higgs, Judge**

---

**No. W2004-00464-CCA-R3-CD  - Filed March 15, 2005**

---

A Shelby County jury convicted the Defendant, Stacy Johnson, of two counts of burglary of a building, two counts of theft of property over $1,000, and eight counts of burglary of a motor vehicle. The trial court sentenced the Defendant to an effective sentence of thirty years. On appeal, the Defendant contends that: (1) the consolidation of the Defendant's indictments deprived him of a fair trial; (2) the evidence is insufficient to sustain his convictions; (3) the State improperly used specific theft locations without proper foundation; and (4) the trial court improperly allowed security videotape recordings to be admitted into evidence. Finding no reversible error, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Paul K. Guibao (on appeal) and Robert Felkner (at trial), Memphis, Tennessee, for the appellant, Stacy Johnson.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michelle Kimbril-Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

A Shelby County jury convicted the Defendant of two counts of burglary of a building, two counts of theft of property over $1,000, and eight counts of burglary of a motor vehicle. The trial court subsequently nolle prosequi the second count of theft of property over $1,000. The trial court sentenced the Defendant as follows: twelve years for each of the burglary of a building convictions, to be served concurrently to each other; twelve years for the theft of property over $1000 conviction,

to be served consecutively to the burglary of a building convictions; and six years for each of the burglary of a motor vehicle convictions, to be served concurrently to each other, but consecutively to the burglary of a building convictions and the theft of property over $1000 conviction. Therefore, the Defendant was sentenced to an effective sentence of thirty years.

The following relevant evidence was presented at the Defendant's trial. Corrie Lee Jones testified that on March 19, 2001, between 10:30 and 11:00 p.m., while he was at work at Cleo Wrap, he received a call from his wife telling him that someone had stolen his car. He testified that his wife told him that the police had called her and told her that they found his car in the parking lot at Seesel's grocery store. He said that, after receiving this call, he went outside to see if his car was there and discovered that it was missing, and he noticed some broken glass on the ground where the car had been parked. Jones testified that a police officer picked him up from work and took him to the Seesel's parking lot where he saw, and retrieved, his car. He said that the steering wheel column and passenger's side window were broken. Jones testified that he did not give anyone permission to drive his vehicle while he was at work. He said that he bought the vehicle in 2000 for approximately $5,000.

On cross-examination, Jones testified that the parking lot at Cleo Wrap was not "really" fenced in, and there were security cameras all around the parking lot, in addition to a security guard. He said that the police talked to the security guard on the night his car was taken and "[t]hey were running the [security] film back." He testified that he did not do any errands or go out to eat on the night his car was stolen, and he did not know exactly what time his car was stolen. Jones testified that he could not identify the Defendant as the person who stole his car, and he had no personal knowledge about who stole his car or when it was stolen.

Fred Martin testified that on March 19, 2001, his vehicle, a 1989 blue Dodge Caravan, was broken into while he was at the Oak Court Mall. He said that he had parked near Goldsmith's. He testified that he and his wife arrived at the mall around 6:00 p.m., and they left the mall around 9:30 p.m. When they walked outside, there was a police officer and several other people standing around his vehicle. He testified that his vehicle, as well as about five or six others, had been burglarized. He said that the front door window on the passenger side of his vehicle had been broken, but nothing was taken from his vehicle. He said that no one had permission to be in his vehicle while he was in the mall. On cross-examination, Martin testified that, after he arrived at the mall, he did not return to his vehicle prior to leaving the mall. He said that he did not have any knowledge as to who broke into his vehicle.

Oliver Currie testified that, on March 19, 2001, he was shopping in Oak Court Mall. He said that he went in the mall around 8:00 p.m., and, when he left the mall, he came out to his car, a 1985 Volvo, and the driver's side window was broken. He said that his paperwork, briefcase, CD's, and other "stuff" were scattered everywhere. Currie testified that he did not believe that anything was taken out of his vehicle, except a couple of CD's, but "it was just a mess." He said that he parked near Goldsmith's. He testified that the store was closing as he walked out, and he got the attention of one of the security guards. Currie testified that he told the security guard what had happened and

she told him that there was another incident around the corner of the mall. He said that he noticed that another white car parked next to his car had also been burglarized. He testified that he did not give anyone permission to be in his vehicle while he was shopping at the mall.

William Sheppard testified that on March 19, 2001, he arrived at Oak Court Mall around 7:15 p.m., and, while he was in the mall, his 1999 Dodge Caravan was burglarized. He said the driver's side, front-door window had been removed from his vehicle, but he could not recall whether anything was missing from his vehicle. Sheppard testified that four other vehicles next to his were also burglarized. He said that he was parked on the east end of the Oak Court Mall near Goldsmith's. He testified that no one had permission to be in his vehicle while he was at the mall.

Kevin Spence testified that he arrived at Oak Court Mall around 8:00 p.m. on March 19, 2001, and he parked behind Goldsmith's. He said that he was driving a red Ford F-250 truck that did not have any damage. He testified that he left the mall at closing time, around 9:00 p.m., and when he got to his vehicle he discovered that the passenger's side window was broken. When he got inside the vehicle, he noticed that a camouflage jacket that he kept behind the seat of the truck was missing. Spence testified that he alerted a security guard at the mall and two police officers arrived shortly thereafter. Spence testified that he also discovered that his sunglasses and work gloves were missing, but he did not know that they were missing until the police returned these items to him. He testified that he recovered the items that had been taken from his car from the police when they told him to go to the Seesel's parking lot where the police had items that they retrieved from another stolen vehicle. He said that no one had permission to be in his vehicle that night.

William Talbert testified that he arrived at the Oak Court Mall at around 7:30 p.m. on March 19, 2001, and he parked outside Goldsmith's. He testified that he was driving a 2000 Jimmy SUV and that there was no damage to his vehicle when he entered the mall. Talbert testified that he left the mall between 8:00 p.m. and 9:00 p.m., and he discovered then that his vehicle had been burglarized. He explained that his right rear window had been opened by "like a crowbar" and the inside "was messed up." Talbert testified that he contacted the police and reported that some change, shears and "miscellaneous stuff" was missing. He said that he saw four or five other vehicles near his, including a van, that were damaged. He said that some of the items that were taken from his vehicle were recovered. He said that he did not give anyone permission to be in his vehicle when he went into the mall.

Shelley Allen testified that on March 19, 2001, someone broke into her 1998 GMC Sierra truck. She said that, on that date, her mother had taken her truck to chorus practice at Eudora Baptist Church, and at 9:30 p.m., her mother called her and told her that someone had broken into her truck. She testified that, when she arrived at the church, she noticed that the back "pop out" window had been broken off and set aside. She said that a raincoat, a walkman CD player, a CD, and a radar detector were taken from her vehicle. Allen testified that the police came to the church and took a report from her. She said that the police then took her to Seesel's where she claimed her items that were laid out on a "bluish silver" car. Allen testified that, other than her mother, no one had permission to be in her vehicle.

Judith Fendley testified that on March 19, 2001, she was at chorus rehearsal at Eudora Baptist Church. She said that she was shopping prior to rehearsal and left her vehicle around 6:45 p.m. to go into the chorus practice, which began at 7:00 p.m. She testified that when she returned to her vehicle, at around 9:15 p.m., she discovered that her driver's side window of her 1998 Chevrolet truck was "crushed, broken in" and that her packages were gone. Fendley testified that she contacted the police, gave the police a list of the items taken from her vehicle, and the police took a report. She said that she had purchased gifts at Target and "[i]t seemed like" she had a tape recorder. She testified that it appeared as though someone had gone through her glove compartment and console compartment. Fendley testified that she was standing with several other people whose vehicles had been broken into, and the police asked them to go across the street to Seesel's parking lot to identify the items, that were in a separate vehicle, that the police had recovered. She testified that no one had permission to be in her vehicle.

Paula Witek testified that on March 19, 2001, she arrived at Eudora Baptist Church around 7:00 p.m., and, when she left the church between 9:15 and 9:30 p.m., she discovered that someone had broken into her car. She said that the driver's side rear window was broken, and the weather strip from around the door was laying on the floor. She testified that it appeared that someone had been in and "ransacked the car," but nothing was missing from the vehicle. Witek testified that two other women, who left the church around the same time, both discovered "the same problem" with their cars. She testified that the police confirmed the damage, took her statement and they told her to wait for the detectives to come. She said that, during that time, she was informed that the police had apprehended a suspect at the Seesel's parking lot. The police told her that she could look for and retrieve any items that she was missing that the police found in the car in which they apprehended the Defendant. Witek testified that she went to Seesel's parking lot because she was unsure if anything had been taken from her vehicle. She said that the police had the items in a blue Buick, and she did not recognize any of the items in that vehicle as belonging to her. She testified that she saw the individual in the backseat of the police car but was unable to identify him. She said that no one had permission to be in her vehicle while she was at the church.

Eugene Sisco testified that he was working at the Mattress Firm on March 19, 2001 and he left the store a little after closing time, at around 8:00 p.m. He testified that the store was broken into later that night. Sisco explained that the right front door was "smashed" and that the desk area had "stuff taken out, thrown all over, cash box was missing." He said that his checkbook was missing from the store and "[t]he place was just a wreck." Sisco testified that he found out about the incident because the police came to his home when they recovered his checkbook, which contained his address. Sisco stated that the tray holding the loose change was missing from the cashbox when he arrived at the store. He said that the police later returned the change drawer and deposit tickets that were in the cashbox. He testified that he did not realize the deposit tickets had been missing until the police returned them. Sisco testified that no one had permission to be in the store, and he did not know the person that broke into the store. He testified that his store is not equipped with surveillance cameras.

James Cox testified that he was working as the assistant manager at Sprint P.C.S. ("Sprint

store") on March 19, 2001, and the store was broken into on that date. He said that he closed the store that day, and he locked the doors and turned off the lights when he left. Cox testified that he was notified between 8:00 p.m. and 10:00 p.m. by the store's alarm company that there was a burglary at the store. He said that the alarm company told him that there was "motion" inside the building and "glass breakage." He testified that he drove to work after the alarm company notified him of the problem, and, when he arrived, he noticed that the right side of the glass entrance door was "totally broken out." Cox testified that a police officer told him to go in the store to identify any missing property. He said that, after a thorough examination, he determined that nothing was missing from the store, but there was a cash drawer that had been pulled out onto the floor and broken. He testified that a metal door leading to the backroom was damaged and had to be replaced because it "was kicked in, kicked open." He said that no one had permission to be in the store after it closed.

Cox testified that, after he advised the police of the damage, he waited a couple hours for the crime unit to arrive. He testified that the police told him there was a man in custody at Seesel's, and, when he walked over to that location, he noticed that the Mattress Firm also had a broken front glass door. Cox testified that the Sprint store has operational camera monitors and glass sensors. He said that the cameras were working that night, and he showed the videotape surveillance to the police. Cox testified that he viewed this videotape and saw someone in the Sprint store after hours, and, although it was dark, he was able to identify the man on the video because "there was a sort of clear shot of him." He said that the man was African-American, had braids, and was wearing some type of jacket. He testified that the videotape was in black and white and the lights were off when the videotape was recorded.

Eddie Scallions, an investigator with the District Attorney General's Office, testified that he was asked to copy and slow down certain videotape recordings from the Seesel's store and the Sprint store. He testified that the State requested that he slow down the videotape recordings because the pictures, at their normal speed, made it difficult to discern what the images were on the tape. He said that the Sprint videotape was slowed down to a speed where "one could look at and recognize an image."

Investigator Scallions testified that he was also asked to take "still shot photos" from the Sprint videotape. He testified that, when he slowed down the Sprint videotape, he was asked to only include the portion with the Defendant. Scallions said that he decided which camera angles to include in the edited tape using a report that described the police's suspect. He explained that the suspect was wearing a knit cap and a bandage, which he used as identifying characteristics. He testified that he relied on the police officers who made the arrest to "catch [him] up" on what happened, and, if a police officer has the wrong information, that would lead him to make incorrect assumptions or to isolate incorrect images on the videotape. Investigator Scallions testified that the person taken into custody matched the description of the individual recorded on the videotape.

Michael Clark, a lieutenant with the Memphis Police Department, testified that, on March 19, 2001, he was involved in the Defendant's arrest. He testified that, shortly after 9:00 p.m., he

heard calls on his radio about multiple automobile burglaries near Goldsmith's in the Oak Court Mall. He said that, shortly thereafter, a similar call came in about automobile burglaries at the Eudora Baptist Church. He said that, at that time, there was a call about a suspicious person, described as an African-American male wearing a "blue skull knit cap" and a "green camouflage type jacket." The officer testified that the suspicious person was at Seesel's in a four-door blue Buick. Lieutenant Clark testified that he sent task force cars to the area to determine if there was anything unusual, and then he followed. When he pulled into the Seesel's parking lot, he saw the blue Buick but there was no one near the vehicle. He testified that the right rear window was broken, and it looked as though the trunk lock had been tampered with. He said that he could not read the car's license plate number because it was blocked from his view by another car. Lieutenant Clark testified that he moved around to the side of Seesel's, so he could watch the store without being noticed. He said that he was approached by someone who said that they called the police. He testified that, a short time later, the Defendant walked out of the front door of Seesel's, looked over and saw him. Lieutenant Clark testified that, at that time, the person who had approached him said "that's the one we're talking about." Clark testified that the Defendant then walked back in the store.

Lieutenant Clark testified that he brought one of the officers in an unmarked police car to the parking lot and the other officer pulled his front bumper up to the rear bumper of the Buick. He testified that he called the "plainclothes" officers in for assistance, and then he left the parking lot "obvious[ly]" because he was in a marked police car and in full uniform. He testified that, at that time, he received a description of the Defendant's clothes. Lieutenant Clark testified that he returned to the parking lot a short time later, and he observed Officer Vaden, Officer Pollard, and Officer Reinhart arresting the Defendant. He said that he looked inside the Buick and saw "assorted property." He testified that he notified the detectives on-duty and the two officers at Eudora Baptist Church and Goldsmith's to tell them to hold their victims. The officer said that he went to the Sprint store, and he was present when the victims came to attempt to identify their property.

On cross-examination, Lieutenant Clark testified that he arrived at the Seesel's parking lot around 9:30 p.m. He said that he tried to get the name and address of the witness that approached him in the Seesel's parking lot but the witness did not want to give it to him. He testified that he had officers on the scene within minutes of the dispatcher's calls. He said that he was not present at the Goldsmith's or the Eudora Baptist Church incidents because he "had [his] hands full at Seesel's." Lieutenant Clark testified that he did respond to the calls at the Sprint and the Mattress Firm stores. He said that, at the Sprint store, the manager was discussing a videotape, and he told the officers to obtain the videotape. He testified that there was a piece of "a club steering lock" inside the Sprint store, and the matching end of that club piece was inside the Buick. He said that there was a Mattress Firm deposit stamp and a cash drawer with deposit slips from the Mattress Firm inside the Buick.

Officer Christopher Vaden testified that he was assigned to the Central Precinct Task Force of the Memphis Police Department, and on March 19, 2001, he received a call that several vehicles had been broken into. He testified that, while in route to that call, the dispatcher advised him that a suspicious person complaint had been received at the Seesel's store. He said that when he received

the suspicious person call, he proceeded to the Seesel's parking lot. Officer Vaden testified that Lieutenant Clark, who was on the scene, gave him information about the suspicious person, including a description of him and what type of vehicle he drove. He recalled that the suspicious person was wearing a "greenish coat and a black skull cap." He recalled that the vehicle's description was of a "Buick Park . . . an Electra Park Avenue" that was blue, and the Defendant was standing by this vehicle. Officer Vaden testified that he observed the Defendant at the Seesel's entrance, and the Defendant was going through a jacket, taking papers out of the jacket and throwing items in the trash can.

Officer Vaden testified that he pulled in behind the Defendant's car, and he noticed that the Defendant was watching Lieutenant Clark who was in a marked police car. He testified that, when the lieutenant left the parking lot, the Defendant approached, and went into, the vehicle. From his position, he saw that the Defendant was starting the vehicle with a screwdriver. Officer Vaden testified that he gave the "takedown signal" and approached the vehicle on foot. He said that the Defendant saw Officer Pollard pulling into the parking lot in an unmarked vehicle, and he got out of the car and ran into Officer Vaden's arms. The officer said that the Defendant still had the screwdriver in his hand. He testified that the police had to struggle with the Defendant, and he, Officer Pollard, and Officer Reinhart had a "difficult time" getting the handcuffs on the Defendant. Officer Vaden testified that, after the police handcuffed the Defendant, the police asked the Defendant what his name was, and the Defendant would not give the police any information. "At one point [the Defendant] gave us a fake name. I believe it was Barry Sanders." He said that the Defendant continued to refuse to give the police any information, and the Defendant was put in a police car and the police began to contact the victims. He testified that, when the Defendant tried to "bail out of the vehicle," the Defendant's cap fell off of him.

Officer Vaden testified that he contacted the vehicle's owner who came to the scene and told the police that the damage to the steering wheel was not there before. He said that there were several items in the vehicle, and he made an inventory of everything in the vehicle on the arrest ticket. He testified that several of the victims were still at the scene giving reports to the police officers, and he called the victims to the vehicle to identify their property. He testified that then he itemized the property that the victims identified in the vehicle and returned the items to the respective owners. He testified that, after the Defendant was detained, he went to the Mattress Firm and the Sprint store, where he observed that the glass entrance doors to both businesses had been broken. He said that he went to the Mattress Firm because the store's coupons and deposit slips were found in the vehicle the Defendant drove.

Alvin Peppers, an officer with the Memphis Police Department Crime Scene Unit, testified that, on March 19, 2001, he worked at several burglary locations. He said that he was called to a Sprint store and a mattress store near the Oak Court Mall. He testified that, when he arrived at the Sprint store, there were other officers at the scene, and he observed a broken front glass door. He said that he was instructed to "photograph, collect, and tag evidence," which he did. He said that the Sprint store's manager, who was present at the time, described to him the condition of the store when the manager left before the burglary compared to the current condition. He identified a picture

that showed an inner officer door that had damage to the "locking mechanism," which the manager said was undamaged before the burglary. Officer Peppers testified that the picture showed footprints on the door that he determined caused the door to open.

Officer Peppers testified that he then went next door to the Mattress Firm where he was also instructed to "photograph, collect, and obtain evidence if there was any." He said that he was not asked to take any fingerprint evidence, which is normally requested unless the officer believes that getting fingerprint evidence is "not feasible." He said that, during his investigation, he determined that fingerprints would not be available because there were many surfaces that "would not hold a fingerprint," and there were gloves found on the scene. He testified that he was then asked to go to the Seesel's parking lot where he photographed a scene that consisted of "a vehicle and other personal items." Officer Peppers testified that the Defendant was present at that time. He testified that he was also requested to take a photograph of the Defendant's tennis shoes to attempt to match his shoes with the footprint found at the Sprint store. He said that he was "not able to match the prints but there was a similarity."

James Sewell, an officer with the Memphis Police Department, testified that, on March 19, 2001, he was involved in the investigation of the burglaries. He said that he responded to a burglary alarm at the Sprint store and, upon arrival at the scene, he discovered that the Mattress Firm, next to the Sprint store, had also been burglarized. He testified that he waited for the representatives of the Sprint store to arrive and he contacted the representative of the mattress store. Officer Sewell testified that the Sprint store had both an alarm system and video surveillance, and he had Officer Peppers obtain the surveillance videotape for evidence. Officer Sewell testified that he viewed the tape at the Sprint store, and he helped an investigator create a slower version and still pictures from the videotape.

Officer Sewell testified that he also assisted at the Seesel's parking lot where the Defendant was apprehended. He said that he helped identify items that had been taken from the Mattress Firm that consisted of a cash register drawer with some coupons and deposit slips from the store. He said that he recalled that the cash register drawer was taken from the garbage can in front of Seesel's and that the deposit slips were in the car or right outside the car. Officer Sewell testified that, when he arrived at the Seesel's parking lot, the Defendant was already in custody, and he recalled that the police recovered a screwdriver and a coat from the Defendant.

Based upon this evidence, the jury found the Defendant guilty of two counts of burglary of a building, two counts of theft of property over $1000, and eight counts of burglary of a motor vehicle. The trial court nollied one count of theft, and sentenced the Defendant to an effective sentence of thirty years on the remaining convictions.

## II. Analysis

On appeal, the Defendant contends first that the evidence is insufficient to sustain any of his convictions. He also contends that: (1) he was denied a fair trial because the offenses in the

Defendant's multiple indictment were consolidated; (2) the State improperly used specific theft locations without proper foundation; and (3) the trial court erred in admitting into evidence the videotape recording.

## A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction may be based entirely on circumstantial evidence where the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Reid, 91 S.W.3d 247, 277 (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citations omitted). While single facts, considered alone, may count for little weight, when all of the facts and circumstances are taken together, they can point the finger of guilt at the Defendant beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Further, "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." Marable, 203 Tenn. 440, 313 S.W.2d at 457; see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

In Tennessee, a person commits burglary who, without the effective consent of the property owner, enters a building other than a habitation (or any portion thereof) not open to the public, with

intent to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-402(a)(1) (2003). Burglary of a building is a Class D felony. Tenn. Code Ann. § 39-14-402(c). Burglary of a motor vehicle occurs when, without the owner's consent, an individual enters a motor vehicle with the intent to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-402(a)(4). A person commits theft of property "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2003). Theft of property is a Class D felony if the value of the property obtained is between $1,000 and $10,000. Tenn. Code Ann. § 39-14-105(3) (2003).

The Defendant contends that the evidence presented at trial is insufficient to sustain his convictions for two counts of burglary of a building, theft of property over $1,000, and eight counts of burglary of a motor vehicle. Specifically, he asserts that the proof at trial showed only the identification of a man with a similar description, and the evidence at trial showed no other testimony that involved the Defendant's identification, including fingerprint evidence. Further, he contends that several of the victims stated that nothing was taken from their vehicles.

We conclude that sufficient evidence was presented for a rational jury to find the Defendant guilty of each and every crime for which he was convicted. First, the evidence is sufficient to prove his theft of property conviction. The evidence at trial showed that on the night of March 19, 2001, Jones received a call that his vehicle, a Buick, had been stolen and that the vehicle was at the Seesel's parking lot. The proof at trial showed that the Defendant was apprehended in this vehicle. Jones testified that he went to the parking lot, identified his vehicle, and the vehicle was released to him. Jones testified that he had purchased the vehicle for $5000 in 2000. At trial, Officer Vaden testified that he saw the Defendant inside the stolen vehicle attempting to start the vehicle with a screwdriver. This evidence is sufficient to sustain the Defendant's conviction for theft of property valued over $1,000.

Similarly, the evidence is sufficient to sustain the Defendant's convictions for two counts of burglary of a building and eight counts of burglary of a motor vehicle. James Cox, a representative from the Sprint store, testified that, on March 19, 2001, his store was broken into and a surveillance videotape recording showed a man, resembling the Defendant, in the store. The jury concluded that the Defendant was the perpetrator. Similarly, Eugene Sisco, the manager of the Mattress Firm store, testified that, on March 19, 2001, his store was broken into, and a cashbox with deposit tickets was missing from the store. The evidence at trial showed that these items were later recovered by the police in the vehicle in which the Defendant was apprehended. This evidence is sufficient to sustain the Defendant's convictions for two counts of burglary of a building.

The evidence is also sufficient to sustain the Defendant's convictions for eight counts of burglary of a motor vehicle. At the Defendant's trial, eight witnesses testified that their vehicles had been broken into. The evidence at trial showed that, in five of these instances, items that were taken from the victims' vehicles were recovered from the vehicle in which the Defendant was apprehended. The evidence at trial showed that, in the three other cases, nothing was taken from the vehicles, however, all of the vehicles were broken into around the same time and in the same area.

Accordingly, considering this evidence in the light most favorable to the State, we conclude that it is sufficient to sustain the Defendant's eight convictions for burglary of a motor vehicle. Since the evidence is sufficient to sustain all of the Defendant's convictions, this issue is without merit.

## B. Failure to Sever Offenses

The Defendant contends that the trial court erred by failing to sever the indictments in this case. The Defendant asserts that severance should have occurred regardless of whether trial counsel objected to the consolidation of offenses. The State asserts that the Defendant has waived this issue because the Defendant did not object to the consolidation of indictments at trial.

Tennessee Rule of Criminal Procedure 14(a) provides that a defendant's motion for severance of offenses "must be made before trial, except that a motion for severance may be made before or at the close of all evidence if based upon a ground not previously known." Furthermore, "[s]everance is waived if the motion is not made at the appropriate time." Tenn R. Crim P. 14(a); see also Tenn. R. Crim. P. 12(b)(5) (request for severance is required to be filed before trial); Tenn. R. Crim. P. 12(f) (issues not raised by pre-trial motion as required by Rule 12(b) are waived). In this case, the Defendant filed no motion to sever the counts of the indictments, and the Defendant first complained of the consolidation of the indictments in his motion for new trial. After thoroughly reviewing the record, we conclude that this issue has been waived because the Defendant failed to object to the offenses being consolidated at trial. Because this issue has been waived, it may only be considered if "plain error" exists. See Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a).

Issues that rise to the level of plain error lie within the sound discretion of the appellate court and may be considered: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice. See Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); State v. Adkisson, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994). In Adkisson, this Court stated that the following factors should be considered by an appellate court when determining whether an error constitutes "plain error:"

> (a) the record must clearly establish what occurred at the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the issue is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42 (citations omitted). Further, "all five factors must be established by the record . . . and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000).

In the present case, the first factor is met because the record clearly shows what occurred at

trial.  The second factor requires the breach of a clear and unequivocal rule of law.  Rules regarding consolidation and severance of offenses are included in the Tennessee Rules of Criminal Procedure. Rule 8(a), concerning the mandatory joinder of offenses, provides that:

> [t]wo or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are know to the appropriate prosecuting official at the time of the return of the . . . presentment(s) . . . and if they are within the jurisdiction of a single court.

Tenn. R. Crim. P. 8(a).  Rule 8(b) of the Tennessee Rules of Criminal Procedure, which allows for the permissive joinder of offenses, states, "Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character."  Tenn. R. Crim. P. 8(b).  Rule 13(a) provides, "The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8."  Tenn. R. Crim. P. 13(a).  Nonetheless, Rule 14 of the Tennessee Rules of Criminal Procedure states that "[i]f two or more offenses have been joined or consolidated for trial . . . the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the  evidence of one would be admissible upon the trial of the others."  Tenn. R. Crim. P. 14(b)(1).  To avoid severance, both portions of the rule must be satisfied.  See State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993); see also, State v. Tolivar, 117 S.W.3d 216, 227-31 (Tenn. 2003).

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court find a common scheme or plan.  In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction.  State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999).

The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure is what the Tennessee Supreme Court has deemed the "primary inquiry" in any severance case, and is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed.  State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984).  Our Supreme Court has stated that "'[u]nless [it is] expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged.'"  Moore, 6 S.W.3d at 239 n.5 (quoting Hallock, 875 S.W.2d at 292).

The Supreme Court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes."  Id. at 240 n.7.  Thus, Tennessee Rule of Evidence 404(b) is relevant to our analysis of this issue.  Rule 404(b) excludes evidence of

"other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged.  See Tenn. R. Evid. 404(b).  Generally, evidence that the accused committed crimes independent of those for which he is on trial is inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity.  See Moore, 6 S.W.3d at 239; see also Tenn. R. Evid. 404(b).  Evidence of other crimes, wrongs, or acts, however, may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'"  Moore, 6 S.W.3d at 239 n.5 (quoting Hallock, 875 S.W.2d at 292).  Offenses arising from the same criminal episode must be joined for the same trial.  Tenn. R. Crim. P. 8(a); see State v. Goodwin, 143 S.W.3d 771, 780 (Tenn. 2004).

We cannot conclude that the trial court erred when it consolidated the Defendant' offenses.  The offenses in this case appear to be part of a common scheme or plan because they are part of the same criminal episode.  The offenses occurred in the same geographic area during the same time period, and evidence of many of the crimes was found in the vehicle in which the Defendant was apprehended.  This connection shows a common plan and, further, evidence of one offense would be admissible in the trial of the other offenses if the offenses had been severed.  Therefore, we conclude that the trial court did not err by allowing the offenses in this case to be consolidated.  This issue is without merit.

### C. Evidentiary Issues

The Defendant contends that he was denied the right to a fair trial because the State used specific theft locations prior to laying a proper foundation at trial, and the trial court erred when it admitted an edited copy of the videotape recordings.

In Tennessee, the determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403.  State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)).  In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial.  State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).  We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion.  State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403.  These rules require that the trial court must first determine whether the proffered evidence is relevant.  Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence."  See Forbes, 918 S.W.2d at 449.  In other words,

"evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000).

After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." James, 81 S.W.3d at 757-58 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 217 (Tenn. Ct. App. 1999)).

### 1. Specific Theft Locations

The Defendant contends that the trial court erred when it allowed the State to use a map during the State's opening statement. The Defendant asserts that the State was improperly allowed to use "labels and markings" to show specific theft locations on the map and that the use of this "anticipated" evidence was prejudicial to the Defendant. At trial, the Defendant objected to the use of the locations on the map at trial and the following discussion between the trial court, Assistant District Attorney Parks, and trial counsel Felkner occurred:

> MS. PARKS: As part of my opening statement, I had our investigator print off a map from MapQuest to indicate the areas that were burglarized on this occasion. I showed it to Mr. Felkner. He opposes the use of this in the opening statement, but the investigator will be testifying today. I will be able to lay a proper foundation and enter it into evidence as an exhibit, but at this point he does object to me using it in opening statement.
>
> THE COURT: Mr. Felkner?
>
> MR. FELKNER: Your Honor, if I can clarify that a little bit. I do not object to the map per se, the fixed locations of Seesel's, the church and Oak Court Mall. I do object to her referring to the cars and things like that just because those - I think Your Honor can take judicial of Seesel's . . . .
> . . .
> MR. FELKNER: . . . I think the fixed locations are fine, but as far as saying, you know, a car was taken here and a car was taken here, I think that's introducing things into evidence that haven't been properly laid a foundation for. So that's what I was opposing, not the map itself.
>
> THE COURT: Well, I don't – I'm going to let her do that. It's just argument by my judgment. I'm going to tell the jury the statements and arguments of lawyers are not evidence. It's subject to you proving what you say. And if she fails to do that, that

gives the defendant an opportunity to contest the opening statement, it becomes an issue. I'm just – but I'll allow you to do that by pointing out this was done here, and they're subject to your linking it up as proof.

MS. PARKS: Yes, Your Honor.

THE COURT: So, I don't, you know I don't have any problem with that. It's an entry responsibility when you make statements in the opening statement, you sort of got to prove it, you know.

Trial courts have wide discretion in controlling arguments of counsel, including opening statements, and a trial court's ruling concerning the arguments of counsel will not be reversed absent an abuse of discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). A trial court should provide both parties the opportunity to present their case theory and the facts upon which they intend to rely, so long as those facts are deemed likely to be supported by admissible evidence. See State v. Stout, 46 S.W.3d 689, 713 (Tenn. 2001). Examining the record, we do not find an abuse of discretion by the trial court in allowing the State to use a map, with labels and markings, to show specific theft locations in the opening statement. This issue is without merit.

### 2. Security Videotape

The Defendant contends that the trial court erred when it admitted several portions of a security videotape. Specifically, the Defendant asserts that the portions of the videotape were not an accurate portrayal of the overall video and that, therefore, the prejudicial effect outweighed the probative value. At trial, the following exchange took place between the trial court, Assistant District Attorney Parks, and trial counsel, Felkner:

MR. FELKNER: At some point, Your Honor, I'm going to object here, not to the Sprint tape because the Sprint tape is a whole copy of the slowed down version. But I am objecting to the duplication of the Seesel's tape because it is a piecemeal copy of the original. Now, I've tried to sit through the tape, and it is a long, long, long tape. I'm not asking that the State reproduce the entire tape, just the 10 or 15 minutes that they say this is going on at Seesel's, because what [Investigator] Scallions did, is he just picked out what he believed or was told to be [the Defendant]. From the tape that I've seen, if you include the other frames, there are many people coming and going. Either cars coming and going from the parking lot. So I would object to the introduction of the Seesel's tape unless it included everything because it's not a properly duplicated tape. It's not authentic. It doesn't show the original. It shows parts of the original that the State wants to show.
. . .
THE COURT: I'm going to allow the tape in. I'm going to allow you as much latitude as you need to weigh the credibility to be given that tape . . . and I will give you any latitude you want.

-15-

The next day, at trial, the following exchange took place:

> MS. PARKS: Well, Your Honor, as we argued yesterday with [Investigator] Scallions on the stand, the defense has a problem with the redacted version of the video tape. Mr. Felkner thoroughly examined [Investigator] Scallions with regards to that video tape. He's alleging that there's exculpatory material within that video tape. I advised him today if there is exculpatory material, that he can go down to our office and view the tape and have it copied. Apparently he did that but is unable to locate - - that's on the video tape. [Investigator] Scallions is not available this week, and I told Mr. Felkner that. He's gone for the rest of the week. He's been well-aware of this tape since the beginning. The last time we were set at trial, he was advised that the[re] were tapes in this matter. And I was unaware at this point that he was going to allege that there was some exculpatory material. I was trying to expedite this matter by only including those portions of the video tape that was relevant to this defendant.
>
> . . . .
>
> MR. FELKNER: . . .My problem with the tape is beyond whether or not it may or may not contain exculpatory evidence, my problem with the tape is it's not a copy as envisioned by the rules of evidence. The rules of evidence state that a copy is an exact duplicate of the original. And this - - it's uncontroverted by any proof before you that this is an edited version of the copy - - of the original. And if I could just read from Rule 1001 of the rules of evidence under a duplicate: A duplicate is a copy produced by the same impression as the original or from the same matrix or by means of photograph, including enlargements, miniatures, or by mechanical or electronic re-recording or by chemical reproduction or by other equivalent techniques which accurately reproduce the original. This is not an accurate reproduction of the original.
>
> All I'm asking is if the State intends to introduce this edited version, that they should be required to introduce the same time lapse that includes all the frames. That's all I'm asking. I'm not saying that they can't use the edited version. That they should just include all of the frames from that relevant time period. That's all I'm asking. I understand that the tapes, the 24 hour surveillance tape, I don't expect the jury to sit here for 24 hours while the store is closed and there's no one in the parking lot. That's not what I'm asking. It's the time that the State is covering in their redacted copy, I'm just asking that they use a copy of the original. That's all I'm asking.
>
> THE COURT: Well, I understand the nature of your objection, and I'm going to overrule the objection. I'm going [to] admit the tape, but by the same token, I have allowed you to ask the witness if that's an accurate copy of all of the frames. He said

-16-

no. He selected some that he thought was relevant. I'll allow you to argue that to the jury that he also said that he saw other persons in the video. I've allowed you to ask him if those persons were dressed a certain way and if those persons could have possibly been the suspect. But you can argue to the jury that somebody else could have committed these actions. That the State did not do a good job of editing the videos. And you believe that the tapes clearly demonstrate that there's a reasonable hypothesis that somebody else committed the crime other than this defendant. . . . so that the argument and the questions goes to the weight and credibility . . . not to the admissibility, but the weight of credibility. I'm going to allow you a large amount of leverage or latitude to attack the tapes themselves.

And I thought that you did a pretty good job of cross-examining this man. He admitted on the witness stand that he said, well, I saw some other male blacks . . . .

The admissibility of videotapes of the crime scene and victims has long been within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed absent a clear showing of an abuse of that discretion. State v. Ronnie Michael Cauthern, No. 02C01-9506-CC-00164, 1996 WL 937660, at *17 (Tenn. Crim. App., at Nashville, Dec. 2, 1996), *no perm. app. filed*; see also State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). Moreover, the trend is to vest more discretion in the trial judge's rulings on admissibility. See Banks, 564 S.W.2d at 949. The Defendant had the opportunity to request that the trial court admit into evidence other portions of the videotape that he believed were relevant and would be helpful, however, he did not do so. We conclude that the trial court did not abuse its discretion by admitting into evidence portions of the surveillance videotape requested by the State, and, therefore, this issue is without merit.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE